UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | No. 6:21-CR-44-REW-HAI |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | RECOMMENDED DISPOSITION |
| | ) | |
| KELLY DWAYNE LEWIS, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

The Court considers a motion to suppress concerning a traffic stop, search, and admissions. Although there are troubling aspects of the stop and how the facts were presented to the Court, the undersigned recommends that the motion largely be denied.

On September 10, 2021, Defendant Kelly Dwayne Lewis, through counsel, moved to suppress "any evidence obtained by the police relating to his arrest and to the search of [Defendant's] vehicle conducted on July 3rd, 2021" and "alleged subsequent statements made by [Defendant] that were taken following the police encounter, but before he was Mirandized." D.E. 25. The motion relied upon his wife's affidavit, the DEA's Report of Investigation, and an article regarding the electronic recording of statements from the DOJ's website. D.E. 25-2, 25-3, 25-4. Defendant filed the bodycam footage of the search of his vehicle with the Clerk's office. D.E. 26, 27 (hereinafter "Rec."). Defendant also moved to seal the motion to suppress. D.E. 24. District Judge Wier referred the motion to suppress to the undersigned. D.E. 28. The government responded in opposition. D.E. 35. The Court conducted a telephonic conference to discuss the scope of any evidentiary hearing. D.E. 40.

The Court conducted an evidentiary hearing on October 12, 2021. D.E. 43. The witnesses included London Police Department Sergeant Jacob Bormann, London Laurel County 911 Center Dispatcher Cody Evans, Laurel County Sheriff's Office DEA Task Force Officer Richard Dalrymple, and Manchester Police Department DEA Task Force Officer Gary Jordan. D.E. 45. The government introduced messages between Defendant and the SOI, the DEA Report of Investigation ("ROI"), photos of the evidence seized from the search of Defendant's vehicle, and the DEA Form 13A into evidence. During the hearing, an additional issue arose concerning statements made by Defendant, during the search of his vehicle and before any *Miranda* warnings were given, in response to questions by TFO Dalrymple. The parties requested a transcript and post-hearing briefing. The transcript was entered on October 28, 2021. *Id.* The government filed a post-hearing brief on November 22, 2021. D.E. 51. The Defendant filed his response and motion to seal the response on December 13, 2021. D.E. 53, 54. Although the government was permitted to file a reply within ten days of Defendant's response, no reply was filed. *See* D.E. 43.

## I. Facts

A federal grand jury issued an indictment on July 22, 2021, charging Defendant with knowingly and intentionally possessing with the intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine. D.E. 9. These charges stem from the traffic stop and subsequent search of Defendant's vehicle on July 3, 2021. This traffic stop was initiated based on a source of information ("SOI") who had contacted DEA TFO Jordan. D.E. 45 at 57. The SOI told TFO Jordan that Lewis, a known source of methamphetamine in Clay County, was traveling to Clay County to distribute methamphetamine. *Id.* at 61. The SOI provided TFO Jordan access to text messages, phone calls, and Facebook

messages to corroborate the information. *Id.* at 58; USA Ex. 1. The SOI also stated that Defendant would be driving either a dark-colored SUV or white Tesla with Indiana registration plates. D.E. 45 at 62. The SOI also provided a photograph of Defendant. *Id.* On July 3, 2021, the SOI showed TFO Jordan a text and photo from Defendant that depicted road signs indicating he "was traveling south on 75 at [the] 64 junction." *Id.*; USA Ex. 1. The SOI also indicated that Defendant was traveling with five pounds of methamphetamine in the vehicle. *Id.* at 63. The SOI later updated TFO Jordan that Defendant was traveling through London. D.E. 45 at 64; USA Ex. 1.

TFO Jordan provided this information to TFO Dalrymple, who then relayed it to Sergeant Bormann. *Id.* at 7. TFO Dalrymple and Sergeant Bormann traveled to Hal Rogers Parkway where they expected the target would likely pass through. *Id.* at 14, 64-65. The two observed a dark-colored SUV with an Indiana registration tags traveling east on Hal Rogers Parkway. *Id.* at 8. Sergeant Bormann and TFO Dalrymple followed the SUV and attempted to run the vehicle's license plate through Dispatcher Evans, but the results indicated "no record, not on file."[1] *Id.* at 24. Sergeant Bormann testified that, when this occurs, he will "usually make a stop and then verify that they have the correct paperwork with the vehicle." *Id.* at 8. Sergeant Bormann and TFO Dalrymple followed the SUV to a Dollar General parking lot and conducted a traffic stop. *Id.* at 8-9. Sergeant Bormann spoke with Defendant and retrieved his license, insurance, and registration. *Id.* at 9. Sergeant Bormann then confirmed with TFO Dalrymple that "this was the person [they] were looking for." *Id.*

---

[1] Sergeant Bormann initially requested Dispatcher Evans to run tag "TK568DCF." *Id.* at 25. But, he apparently read the "D" incorrectly because, once the tag was provided in person, the number was discovered to be "TK5680CF." *Id.* at 25, 28-29 However, the correct tag also returned "not on file or no record." *Id.*

3

Sergeant Bormann returned the documents and asked "if [Defendant] had anything in the vehicle he needed to know about." *Id.* When Defendant responded that he did not, Sergeant Bormann requested to search the vehicle. *Id.* Defendant declined and Sergeant Bormann stated that he would conduct an exterior search of the vehicle with a K-9. *Id.* Defendant then retrieved a suspected marijuana joint from the center console of the vehicle and handed it to Sergeant Bormann and said, "This is all I've got in here." *Id.* At this point, Sergeant Bormann smelled the odor of marijuana. *Id.* at 18. Sergeant Bormann then asked Defendant to step out of the vehicle so that he could conduct a search of it. *Id.* at 10. During the search, Sergeant Bormann located a bag of suspected marijuana from the center console where the marijuana joint was located. *Id.* Sergeant Bormann also located a backpack in the passenger compartment that contained five bags of suspected methamphetamine.[2] *Id.* at 11. Sergeant Bormann then placed Defendant in handcuffs but did not state that he was under arrest or advise him of his *Miranda* rights. Rec. at 01:31-01:50. TFO Jordan arrived at the scene at this time and stood with Defendant. D.E. 45 at 66; Rec. at 02:16-02:18.

While Sergeant Bormann completed the search of Defendant's vehicle and retrieved the bags of suspected methamphetamine, TFO Dalrymple asked, "How much you got here, bro?" Rec. at 02:11-02:12. TFO Dalrymple testified this was a reference to how much methamphetamine was in the car. D.E. 45 at 52. The bodycam footage shows Defendant's lips moving while he appears to mutter something inaudibly. Rec. at 02:16-02:19. Sergeant Bormann simultaneously responded, "It feels like four." Rec. at 02:17-02:19. TFO Dalrymple

---

[2] The bodycam footage appears to begin just before Sergeant Bormann located the backpack. Rec. at 00:00-01:31. Sergeant Bormann testified that he believed that he activated his bodycam when he first stepped out of his vehicle. D.E. 45 at 16. Although Sergeant Bormann had not reviewed the footage, he testified that a malfunction could have occurred that caused the bodycam to not begin recording until the search of Defendant's vehicle was underway, such as his failure to "not swipe down far enough" to activate it. *Id.*

also asked, "Hey, you ever been to prison, brother?"  Rec. at 02:47-02:49. Defendant responded affirmatively, and TFO Dalrymple then asked, "For what?".  Rec. at 02:50-02:52.  The bodycam footage audio sounds as though Defendant responded, but the response is unintelligible.  02:51-02:52.  The rest of the bodycam footage depicts additional law enforcement personnel arriving and processing the scene.  Rec. at 02:53-14:01.

Sergeant Bormann and TFO Dalrymple then transported Defendant to the London Police Department, which took approximately ten to fifteen minutes.  D.E. 45 at 11, 69.  TFO Jordan arrived a few minutes later and immediately advised Defendant of his rights by reading a DEA Form 13A, which was around fifteen to twenty minutes after Defendant was transported from the Dollar General parking lot.  *Id.* at 68-69.  Defendant was "cooperative" in response to being read his *Miranda* rights.  *Id.* at 71.  TFO Jordan was the primary interrogator, but TFO Dalrymple asked questions as well.  *Id.*  Defendant then "advised that he had, a couple weeks prior, sold one pound of methamphetamine to the Clay County distributor, [who] lives off of Highway 472, for $3,000.  And he had charged them $3,000 for the five pounds that he was bringing that night, and they'd paid him prior."  *Id.* at 71.  Following the interview, Defendant was transported to the Laurel County Detention Center with a federal holder.  *Id.* at 72.

The facts found above are not contradicted by any evidence offered by the defense and are supported by the record without relying upon TFO Dalrymple's testimony.  This is critical because TFO Dalrymple's initial testimony concerning an obvious and important issue was false.  Given that falsity on such a material issue, the Court rejects his testimony in its entirety.  The defense's motion squarely put in issue whether Defendant was *Mirandized* prior to making any statements.  D.E. 25 at 1.  TFO Dalrymple testified on direct that Defendant was *Mirandized* before being questioned at the London Police Department.  D.E. 45 at 37.  On cross, he testified

that, although he did not recall whether *Miranda* warnings were given during the stop, he did not "try to talk with" Defendant at that time. *Id*. at 44-45. Then, following a break to publish the bodycam footage and upon questioning by the Court, TFO Dalrymple acknowledged questioning Defendant at the scene, while handcuffed but without *Miranda* warnings, about the quantity of methamphetamine in the car and his criminal history. *Id*. at 51-54. In its post-hearing memorandum, the government characterizes the change as the result of a refreshed recollection (D.E. 51 at 12 n.2), but the Court disagrees. TFO Dalrymple's testimony on direct and cross was unequivocal and did not suggest any lack of recollection concerning whether Defendant was questioned by him during the stop and search. In other words, instead of testifying he "did not recall" whether he asked Defendant questions during the stop, TFO Dalrymple declared he did not. The recording demonstrates Defendant was questioned by TFO Dalrymple on the central issue of the amount of methamphetamine in the car. The patent falsity requires that the entirety of TFO Dalrymple's testimony be rejected.

## II. The Traffic Stop did not Violate the Fourth Amendment

The Fourth Amendment guarantees the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. However, "officers may stop a vehicle with probable cause to believe a traffic violation or other civil infraction was committed, or where the stop is supported by reasonable suspicion of criminal activity." *United States v. Salas*, 820 F. App'x 405, 411 (6th Cir. 2020) (citing *States v. Collazo*, 818 F.3d 247, 253-54 (6th Cir. 2016)). In the context of traffic stops, probable cause is established when "an officer observes a motorist violate a traffic law." *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

On the other hand, reasonable suspicion requires only "more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person of criminal activity." *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008) (internal citation omitted). An officer "must point to specific and articulable facts supporting his suspicion." *United States v. Perez*, 477 F. App'x 337, 341 (6th Cir. 2012) (internal citation omitted). The Court considers the totality of the circumstances when determining the existence of reasonable suspicion. *Salas*, 820 F. App'x at 411.

A distinctive and matching description of a vehicle can be a critical factor in assessing the existence of reasonable suspicion. *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000). Likewise, confirming the expected location of a vehicle and the direction in which it is going also support a finding of reasonable suspicion. *United States v. Molina*, 226 F. App'x 523, 528 (6th Cir. 2007) ("Observing a vehicle that matched the exact description and location of the car in question certainly gave rise to reasonable suspicion of criminal activity." (internal quotation omitted)); *see also United States v. Simms*, No. 20-9-DLB-EBA, 2020 WL 7769092, at *2 (E.D. Ky. Dec. 30, 2020) ("While the proximity of the vehicle based on the time that had elapsed was more exact in *Hurst*, here, unlike in *Hurst*, the officer knew the road on which the vehicle was travelling and the direction in which it was going.").

Further, reasonable suspicion may be based upon reliable information from various sources of information. *See Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) ("[T]he officer's reasonable suspicion need not arise exclusively from his own direct observations. Rather, it can be derived from such sources as informant tips, dispatch information, and directions from other officers."); *see also Salas*, 820 F. App'x at 412–13 (finding sufficient reasonable suspicion where a confidential informant "whose information had been reliable in the

7

past, informed officers of a pending drug delivery and provided the vehicle's description prior to
the stop").

Here, the stop of Defendant's vehicle was supported by reasonable suspicion of criminal
activity.  TFO Jordan testified that he had known the SOI for five years and that the information
provided was reliable and corroborated through text messages.  D.E. 45 at 58-61, 75.  The SOI
stated that Defendant was a known source of supply of methamphetamine to Clay County, would
usually drive a dark-colored SUV or white Tesla, and always had Indiana license plates on his
vehicle.  *Id.* at 61-62.  On July 3, 2021, the SOI also stated that Defendant was traveling "south
on 75 at [the] 64 junction" with five pounds of methamphetamine, and provided a confirming
screenshot.  USA Ex. 1; *id.* at 62-63.  The SOI also communicated that Defendant was in
London.  *Id.* at 64.  This information was communicated to TFO Dalrymple, who then relayed it
to Sergeant Bormann.  *Id.* at 7, 63.  Sergeant Bormann and TFO Dalrymple observed a vehicle
matching this description traveling in the direction and vicinity where Defendant's vehicle would
have been based on the information from the SOI.  *Id.* at 8.  When the registration tags returned
as "not on file," Sergeant Bormann and TFO Dalrymple conducted the traffic stop.  *Id.*  Thus,
based on the totality of the circumstances, including the corroborated information provided by
the SOI and matching location and description of the vehicle, Sergeant Bormann and TFO
Dalrymple had reasonable suspicion of criminal drug activity to conduct the traffic stop.

Although unnecessary due to the existence of reasonable suspicion of criminal activity,
there was also sufficient probable cause to conduct the traffic stop.  "An officer may stop and
detain a motorist so long as the officer has probable cause to believe that the motorist has
violated a traffic law."  *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009).  Sergeant
Bormann testified that he attempted to run the license plate on Defendant's vehicle through the

Laurel County Dispatch Center.  D.E. 45 at 8.  However, the results returned as "no record, not on file."  *Id.* at 24.  According to Kentucky law:

> Before the owner of a motor vehicle, other than a motor vehicle engaged in the transportation of passengers for hire operating under a certificate of convenience and necessity, may operate it or permit its operation upon a highway, the owner shall apply for registration in accordance with administrative regulations promulgated by the cabinet . . . If the owner of a motor vehicle does not reside in the Commonwealth, the motor vehicle shall be registered with the county clerk of the county in which the motor vehicle is principally operated.

Ky. Rev. Stat. Ann. § 186.020(1).  Sergeant Bormann and TFO Dalrymple had probable cause to conduct the stop for a violation of Kentucky law.  *See United States v. Mungia*, 743 F. Supp. 2d 694, 700 (E.D. Mich. 2010) (finding probable cause, in part, because a check of Defendant's license plate resulted in "no record"); *see also United States v. Justice*, 464 F. App'x 448, 451–52 (6th Cir. 2012) (finding probable cause where no registration record of Defendant's vehicle existed).  Thus, in addition reasonable suspicion, there was probable cause to stop the vehicle based on the registration returning as not on file.[3]

Defendant argues that there was no probable cause to conduct the traffic stop.  First, Defendant compares the facts of this case to *United States v. Goodwin*, No. 98-6415, 2000 WL 64972 (6th Cir. Jan. 12, 2000).  D.E. 54 at 2-4.  In *Goodwin*, an officer observed two vehicles parked next to each other on a gravel road.  *Goodwin*, 2000 WL, 64972, at \*1.  The officer approached the vehicles, believing a "rash of thefts and vandalism had taken place in the area on prior occasions."  *Id.*  The officer alleged that the defendant had violated state law by blocking a public roadway.  *Id.* at \*2.  However, the officer did not issue a citation and was not able to identify any local ordinance or state law to support his contention.  *Id.*  Further, neither the

---

[3] The defense offers no authority that the mistakenly reported tag number invalidated the stop.  There is no evidence that the mistake was due to any bad faith or misconduct.  The apparent honest mistake does not give rise to any deterrence interest.  Additionally, even when corrected, the records check also returned no record on file.  D.E. 45 at 28-29.

district court's opinion nor the record identified what state law the defendant allegedly violated. *Id.* Thus, the Sixth Circuit held that officer's testimony lacked credibility and probable cause to initiate the traffic stop had not been established. *Id.* at *2-3.

Second, Defendant argues that this case is similar to *United States v. Holston*, 2:18-CR-107-JRG, 2019 WL 3574613 (E.D. Tenn. July 15, 2019), *report and recommendation adopted*, 2:18-CR-107, 2019 WL 3558592 (E.D. Tenn. Aug. 5, 2019). D.E. 54 at 4-5. In *Holston*, an employee reported a suspicious person in the vicinity of an Exxon gas station. *Holston*, 2019 WL 3574613, at *1. A responding officer observed a vehicle matching the provided description near the gas station. *Id.* Without witnessing any traffic violations, the officer stopped the vehicle. *Id.* The officer proceeded to question the defendant, and the court held that the interaction could not "be described as directed towards the initial justification or 'mission' for the stop." *Id.* at *5 (citing *Rodriguez v. United States*, 575 U.S. 348, 349 (2015)). Although the officer asked some questions related to the purpose of the stop, he then prolonged the stop with unrelated questions. *Id.* at *6. The officer also observed an open container in the vehicle, but, instead of issuing a citation for that violation, pursued a separate investigation into whether the vehicle contained drugs, for which the officer had "no justification, no reasonable suspicion." *Id.* The officer prolonged the stop by asking for permission to search the vehicle. *Id.* at *2. The defendant refused consent but eventually admitted that there was cocaine in the vehicle. *Id.* Thus, the court held that the defendant's admission and evidence obtained from the subsequent search of the vehicle should be suppressed as fruit of the poisonous tree. *Id.* at *8.

Finally, Defendant argues that this case is similar to *United States v. Gilliam*, 275 F. Supp. 2d 797, 800-01 (W.D. Ky. 2003). D.E. 54 at 5-6. In *Gilliam*, an officer conducted a traffic stop based on a California law requiring vehicles registered in the state have two license

10

plates. *Gilliam*, 275 F. Supp. 2d at 800-01. However, the vehicle was registered in Kentucky, which only requires the use of a single license plate. *Id.* at 800, 804. Thus, the court held that the officer's mistake of law did not excuse the unlawful stop and suppressed the evidence seized. *Id.* at 804-05. The court declined to permit a *post hoc* justification for the stop that the vehicle was traveling below the speed limit in the left lane of traffic, in part, because it was at most a *de minimis* violation. *Id.* at 805-06. The court also held that, even if there was a lawful basis for the traffic stop, there was no reasonable suspicion or probable cause to support the subsequent investigatory detention. *Id.* at 807.

Defendant argues that the facts of his traffic stop are similar to the ones in the aforementioned cases. First, Defendant argues that no traffic citation was issued and there is otherwise no evidence he committed a traffic violation. D.E. 54 at 2-6. Second, Defendant notes that TFO Dalrymple admitted that the basis of the stop was solely based on the SOI's description of the vehicle. *Id.* Finally, Defendant indicates that Defendant withheld consent to search his vehicle and the officers had no warrant for such a search. *Id.* This final point is addressed in the next section.

The instant case is distinguishable from *Goodwin*, *Holston*, and *Gilliam* for multiple reasons. First, as discussed, the officers had ample reasonable suspicion for the stop based on the corroborated information from the SOI. This SOI proved to be reliable and TFO Jordan testified that he has known the SOI for five years. The officers matched the description of the vehicle given by the SOI with Defendant's vehicle. None of the three cases Defendant relies on involved reasonable suspicion to support the traffic stops, and this alone is enough to distinguish his case. Second, there was also probable cause to stop Defendant's vehicle. Despite Defendant's argument to the contrary, there was evidence of a traffic violation based on the

11

registration tags returning as not on file which provided Sergeant Bormann and TFO Dalrymple with probable cause to conduct the stop.

While Defendant correctly points out that no traffic citation was issued, this is not required for a lawful traffic stop. In *Goodwin*, the Sixth Circuit held that the officer's testimony lacked credibility because he did not issue a citation for a traffic violation and could not otherwise identify a law or ordinance that the defendant violated as a basis for the stop. *Goodwin*, No. 98-6415, 2000 WL 64972, at *1. Thus, because it did not credit any of his testimony, the court held that the officer lacked probable cause for the stop. *Id*. The court in *Holston* factored the lack of citation for the open container violation into its *Rodriguez* analysis. The court held that the officer unlawfully prolonged the stop because he pursued an investigation into the presence of drugs, for which he had no reasonable suspicion. *Holston*, 2019 WL 3574613, at *6. While no citation was issued in the instant case, the officers had reasonable suspicion of criminal activity to conduct the traffic stop. Issuance of a citation was not constitutionally required.

Third, although the Court rejects the testimony, Defendant is mistaken that TFO Dalrymple admitted that the basis of the stop was solely based on the SOI's description of the vehicle. TFO Dalrymple testified that the response on the tag was also part of the basis for conducting the stop:

> Q. And what was the basis of the traffic stop?
>
> A. Where **Sergeant Bormann's response on the tag**, the fact that the car met the description based on the color, based on the tag, based on the time, based on the route, and -- I think that's it.

D.E. 45 at 41 (emphasis added). Sergeant Bormann also confirmed that it was not until after the registration tags returned as not on file that he initiated the stop. D.E. 45 at 15.

12

The Court notes that, if the facts were different, meaning reasonable suspicion of criminal activity was lacking and the stop was limited to the observed traffic violation, significant scrutiny would be applied to the initial question asked by Sergeant Bormann, specifically "if [Defendant] had anything in the vehicle [Bormann] needed to know about." D.E. 45 at 9. In that scenario, the duration of the stop would be closely examined to assess whether it was extended beyond the tasks tied to the stop under *Rodriguez v. United States*, 135 S. Ct. 1609 (2015). Bormann's question was undoubtedly generally investigative in nature. Some courts, even after *Rodriguez*, have found such a question to be permissible. *See United States v. Freeman*, 2:20-CR-20058-JTF, 2020 WL 7234152, at *5 (W.D. Tenn. Oct. 14, 2020), *report and recommendation adopted*, 2:20-CR-20058-JTF-1, 2020 WL 7232876 (W.D. Tenn. Dec. 8, 2020). The specific facts always control, but law enforcement is cautioned that such a broad question strikes the Court as an attempt to create a situation in which nearly any response could be argued to give rise to reason to extend the stop beyond its initial purpose. Questioning by law enforcement in such a situation should be limited to "ordinary inquiries incident to the traffic stop." *Illinois v. Caballes*, 125 S. Ct. 834, 837 (2005). Such inquiries usually encompass things like checking a driver's license, querying for wants and warrants, and inspecting automobile registration or proof of insurance. *See Rodriguez*, 135 S. Ct. at 1615. Suppression will follow if law enforcement crosses these boundaries without sufficient reasonable suspicion.

### III. There was Probable Cause to Search Defendant's Vehicle

Sergeant Bormann had probable cause to search Defendant's vehicle for evidence of drug trafficking. An officer has probable cause to conduct a search when the available facts would warrant a person of reasonable caution to believe that evidence of a crime is present. *Florida v. Harris*, 568 U.S. 237, 243 (2013). This practical and common-sense standard considers the

13

totality of the circumstances and requires only the kind of fair probability upon which reasonable and prudent people would act. *Id.* at 243-44. Sergeant Bormann suspected the joint was marijuana based on the smell emitted once Defendant handed it to him. D.E. 45 at 18; *see also United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993) ("smelling marijuana . . . constituted probable cause to believe that there was marijuana in the vehicle"). At that time, probable cause existed to search the vehicle. *See United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002) ("This court has held that an officer's detection of the smell of marijuana in an automobile can by itself establish probable cause for a search."); *United States v. Lott*, No. 6:17-CR-52-GFVT, 2018 WL 2347072, at *3 (E.D. Ky 2018), *aff'd*, 954 F.3d 919 (6th Cir. 2020) ("As soon as Lott admitted to marijuana in the console, Trooper King had probable cause to search the car."). The permissible scope of the search extended to the backpack because if "the police have probable cause to search a lawfully stopped vehicle for contraband, then the police have probable cause to search every part of the vehicle and all containers found therein in which the object of the search could be hidden." *United States v. Stubblefield*, 682 F.3d 502, 507 (6th Cir. 2012). Thus, the search of Defendant's vehicle was constitutional despite Defendant's lack of consent.

Defendant's reliance upon *United States v. Thomas*, 434 F. Supp. 3d 576 (W.D. Ky 2020) does not support suppression. In *Thomas*, the government contended the discovery of an open alcohol container established probable cause to search the vehicle and legitimize the discovery of a firearm therein. *Thomas*, 434 F. Supp. 3d at 582. Judge McKinley rejected that argument by extending the rationale of *Jennings v. Commonwealth*, No. 2014-CA-00089-MR, 2016 WL 447754 (Ky. App. Feb. 5. 2016), which concluded that possession of an open alcohol container is not a crime under Kentucky law. *Id.* at 583. So, in *Thomas*, there was no probable cause to

believe the vehicle would contain evidence of a crime.  Here, the revelation of the marijuana supplied an adequate crime in the probable cause analysis.

### IV. Defendant's Statements During the Traffic Stop Must be Suppressed

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  The Supreme Court has held that certain warnings, such as the right to the presence of an attorney, to remain silent, and that any statement made may be used against him in a criminal trial, must be given before any custodial interrogation.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Defendant argues that any statements made prior to being read his *Miranda* rights should be suppressed.  The government concedes that it will not seek to admit any statements made by Defendant while in custody before his *Miranda* rights were given (D.E. 51 at 13-14), and the Court finds that any such statements should be suppressed.  The United States states there is "no doubt" that Defendant was in custody during the traffic stop after he was placed in handcuffs and while TFO Dalrymple questioned him.  D.E. 45 at 13-14.

As to whether an interrogation occurred, this includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *United States v. Woods*, 711 F.3d 737, 740-41 (6th Cir. 2013).  TFO Dalrymple asked Defendant how much of the suspected drugs he had in the vehicle, whether he had been to prison before, and for what offense he had previously served time in prison.  Rec. at 02:11-02:19, 02:47-02:52.  These questions were reasonably likely to elicit an incriminating response from Defendant.  The question concerning how much methamphetamine Defendant had went to the heart of the matter under investigation.  Defendant's criminal history may evidence general propensity for trafficking in drugs and prohibited status under 18 U.S.C. § 922(g), as

being "in prison" suggests felony time. Such questioning, without the benefit of *Miranda* warnings, must be deterred. *United States v. Patton*, 3:10-CR-31, 2010 WL 5812377, at *23 (E.D. Tenn. Dec. 28, 2010) (suppressing Defendant's responses to questions about his criminal history where *Miranda* warnings were not given), *report and recommendation adopted*, 3:10-CR-31, 2011 WL 587141 (E.D. Tenn. Feb. 10, 2011), *aff'd*, 517 F. App'x 400 (6th Cir. 2013).

Although the government asserts that Defendant did not appear to answer any of TFO Dalrymple's questions (D.E. 51 at 11), Defendant can clearly be heard answering "Yeah" after being asked if he had ever been to prison. Rec. at 02:48-02:49. This is further evidenced by TFO Dalrymple then asking Defendant "For what?" *Id.* at 02:50-02:51. However, based on the bodycam footage audio, it is unclear whether Defendant responded to TFO Dalrymple's earlier question regarding how much of the suspected drugs were in the vehicle. *Id.* at 02:11-02:19. Nevertheless, inaudible responses do not preclude suppression. *See Patton*, 2010 WL 5812377, at *23 (suppressing Defendant's responses during a custodial interrogation prior to *Miranda* warnings being given, even if inaudible). Defendant was subjected to custodial interrogation during the traffic stop prior to being notified of his *Miranda* rights. Accordingly, any statements made by Defendant at the scene of the traffic stop in response to TFO Dalrymple's questions should be suppressed.

### V. The Subsequent *Miranda* Warnings were Effective

The Defendant argues that any statements made after the *Miranda* warnings were read at the London Police Department should also be suppressed. According to Defendant, his statements were made **before** the warnings were given or the *Miranda* warnings were ineffective and did not break the unwarned stream of questioning that began at the scene of the traffic stop. D.E. 54 at 10-13. In his post-hearing memorandum, "Lewis contends that statements he made

16

were before he was given his Miranda rights, and there is no recording to show otherwise." D.E. 54 at 13. To the extent he claims he was not *Mirandized* prior to making statements during the exchange at the London Police Department, the evidence indicates that he was, and the defense offered no proof to the contrary. TFO Jordan testified he immediately *Mirandized* Defendant upon arrival and then began speaking with him (D.E. 45 at 68-69, 71), and there is no evidence that questioning occurred or responsive statements were made at the London Police Department prior to that point in time. So, the record establishes unwarned questions and answers during the stop and search, but that intervening warnings were given prior to any questioning at the London Police Department.

The Supreme Court, in a plurality opinion, addressed this scenario and set forth a five factor balancing test to determine whether *Miranda* warnings delivered "midstream" can be effective to avoid suppression of the post-*Miranda* statements:

> (1) the completeness and detail of the questions and answers in the first round of interrogation; (2) the overlapping content of the two statements; (3) the timing and setting of the first and second rounds; (4) the continuity of police personnel; and (5) the degree to which the interrogator's questions treated the second round as continuous with the first.

*Missouri v. Seibert*, 542 U.S. 600, 615 (2004). This test has been adopted by the Sixth Circuit. *United States v. Ray*, 803 F.3d 244, 272 (6th Cir. 2015). "The threshold issue when interrogators question first and warn later is . . . whether it would be reasonable to find that in these circumstances the warnings could function effectively as *Miranda* requires." *Seibert*, 542 U.S. at 611-12.

As to the completeness and detail of the questions and answers, this factor weighs in favor of effectiveness of the *Miranda* warnings. TFO Dalrymple's questions were brief and not thorough in nature compared to the questioning that occurred in *Seibert*, in which the

17

interrogation left "little, if anything of incriminating potential left unsaid." *Seibert*, 542 U.S. at 616. The exchange at the London Police Department was more detailed than the questioning that occurred at the scene of the traffic stop. Although pointed in terms of criminal exposure, TFO Dalrymple's questions at the scene of the stop focused upon the narrow topics of the discovered drugs and Defendant's criminal history. Defendant's responses are vague, at best. During the second interrogation, Defendant was prompted to detail his role in drug trafficking in Clay County in the weeks prior to the traffic stop. D.E. 45 at 71; *see also* D.E. 25-3.

Next, the undersigned considers the overlapping content between the two statements and the degree to which the interrogator's questions treated the second round as continuous with the first. These factors also weigh in favor of finding that the *Miranda* warnings were effective. During the first interrogation, the only audible response from Defendant was that he had previously served time in prison. There is no evidence Defendant's criminal history was discussed in the interrogation at the London Police Department. D.E. 45 at 71; *see also* D.E. 25-3. Again, only during the second interrogation did Defendant detail his involvement in drug trafficking.

While Defendant did mention the amount of methamphetamine in his vehicle during the second interview, the bodycam footage and audio do not indicate that Defendant gave this information during the first interrogation. D.E. 25-3; Rec. at 02:11-02:19. Further, it is unclear whether Defendant was asked directly about the amount of methamphetamine in his vehicle during the post-*Miranda* interview or if he volunteered this information. *See* D.E. 25-3. Regardless, these facts weigh in favor of finding that the *Miranda* warnings were effective. *See United States v. Conway*, 17-43-DLB-CJS, 2018 WL 4600306, at *14 (E.D. Ky. June 4, 2018), *report and recommendation adopted*, CR 17-43-DLB-CJS, 2018 WL 3435353 (E.D. Ky. July 17,

2018) (finding that second and fifth factors weighed against finding continuity, because, prior to the *Miranda* warnings, the defendant was largely unresponsive, his statements were not inculpatory, and he made an incriminating statement only after he received his *Miranda* warnings).  Any overlap in content between the two statements was minor, and, thus, these factors weigh in favor of finding that the *Miranda* warnings were effective.

The timing and setting of the interrogations also weigh in favor of finding the *Miranda* warnings were effective.  In *Seibert*, the two interrogations took place at the same location within fifteen to twenty minutes of each other.  542 U.S. at 616.  In the instant case, based on the body cam footage and TFO Jordan's testimony, approximately twenty-five to thirty minutes elapsed between the interrogations.  D.E. 45 at 69; Rec. at 02:47-14:01.  Further, the first line of questioning occurred at the scene of the traffic stop, while the second line of questioning occurred at the London Police Department.  In other cases, similar facts have resulted in this factor weighing in favor of the *Miranda* warnings being effective.  *See Conway*, 2018 WL 4600306, at *14 (finding the change in location and twenty-six minutes elapsing between interrogations weighed in favor of the effectiveness of the *Miranda* warnings).  Accordingly, the time and location change between the interrogations weigh in favor of the *Miranda* warnings being effective.

On the other hand, the continuity of police personnel clearly weighs against finding that the *Miranda* warnings were effective. The Sixth Circuit has found continuity of police personnel where the officers from the same agency and task force were present during the pre-*Miranda* statements and the post-*Miranda* interview, even if the same person was not present for both. *United States v. Ray*, 690 F. App'x 366, 375 (6th Cir. 2017).  The instant case involves an even clearer continuity of police personnel.  TFO Dalrymple and TFO Jordan are not only with the

19

same agency, the DEA, they were both present during the post- and pre-*Miranda* statements.
TFO Jordan arrived just as Defendant was being placed in handcuffs, before TFO Dalrymple
began asking questions, and can be seen in the bodycam footage standing directly next to
Defendant as the questioning begins.  D.E. 45 at 65-66; Rec. at 02:16-02:18.  TFO Jordan was
the primary interrogator during the post-*Miranda* interview.  D.E. 45 at 71.  Further, TFO
Dalrymple asked the pre-*Miranda* questions and was present during the post-*Miranda* interview.
*Id.*  Clearly, there was a continuity of police personnel between the two interrogations, resulting
in this factor weighing in favor of the *Miranda* warnings being ineffective.  However, this single
factor does not outweigh the other four that favor the effectiveness of the *Miranda* warnings.
Accordingly, the *Seibert* factors, when considered together, weigh in favor of finding that the
*Miranda* warnings were effective.

The final inquiry is whether Defendant made a voluntary, knowing, and intelligent
waiver of his *Miranda* rights.  *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United
States v. Crumpton*, 824 F.3d 593, 606 (6th Cir. 2016); *United States v. Adams*, 583 F.3d 457,
467 (6th Cir. 2009) ("A specific factual inquiry must be made to determine if, under the totality
of the circumstances, the defendant has waived his rights.").  "It is the government's burden to
establish a waiver by a preponderance of the evidence." *Adams*, 583 F.3d at 467.  Such a waiver
must have been "the product of deliberate choice rather than intimidation, coercion or
deception."  *Id.* (citing *Machacek v. Hofbauer*, 213 F.3d 947, 954 (6th Cir. 2000)).  A waiver
may be inferred when a defendant proceeds to speak after being informed of and indicating he
understands his rights.  *Id.*

While no written waiver was executed by Defendant, this does not preclude a finding that
he waived his rights.  *See id.* at 467-68.  Rather, the preponderance of the evidence indicates

Defendant made a knowingly, voluntarily, and intelligently waiver by cooperating with law enforcement and answering questions after being advised of his rights.  D.E. 45 at 71.  The defense presented no evidence to the contrary.  Accordingly, Defendant's post-*Miranda* statements should not be suppressed.

## VI. Conclusion

Based upon the foregoing, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress (D.E. 25) be **GRANTED IN PART** and **DENIED IN PART**.  To the extent that any statements were made by Defendant in response to TFO Dalrymple's questioning at the scene of the traffic stop, those statements should be suppressed.  Otherwise, any evidence that was seized as a result of the constitutional search of Defendant's vehicle and any statements made by Defendant after he was notified of and waived his *Miranda* rights at the London Police Department should not be suppressed.

The Court issues this Recommended Disposition pursuant to 28 U.S.C. § 636(b)(1)(B). The parties should consult that statute and Federal Rule of Criminal Procedure 59(b) concerning the right to appeal to the District Judge.  Any objection must be filed within **fourteen days** of the entry of this recommendation.  Failure to object per Rule 59(b) waives a party's right to review. Upon expiration of that fourteen-day period, this matter will be submitted to Judge Wier for his consideration.

This the 24th day of January, 2022.



Signed By:

Hanly A. Ingram

United States Magistrate Judge