UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:21-CR-44-REW-HAI |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| KELLY DWAYNE LEWIS, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

The matter before the Court is Magistrate Judge Ingram's Recommended Disposition addressing Defendant Kelly Dwayne Lewis's motion to suppress. *See* DE 58 (Recommended Disposition). Lewis, facing an aggravated meth trafficking charge, moved to suppress evidence from and statements following a July 3, 2021, Laurel County stop. Judge Ingram largely recommended denial. Lewis objects to several of Judge Ingram's findings and asks the Court to decide the matter contrary to the ruling. *See* DE 59 (Objections). The Government responded in support of the Recommended Disposition. *See* DE 61 (Response). Lewis replied. *See* DE 62 (Reply). The matter has been exhaustively briefed—through the original motion to post-hearing filings to post-recommendation objections (with attendant filings). The record brims.

Having thoroughly reviewed the full record and all briefing, the Court **ADOPTS** the Recommended Disposition and **OVERRULES** Lewis's objections. Lewis imposes too granular and exacting a bar in his scrutiny of the stop and search bases. Authorities had sound and lawful reasons for each. TFO Dalrymple's concerning missteps, post-seizure, warranted Judge Ingram's rebuke, but law enforcement effectively complied with *Miranda* in securing a voluntary statement from Lewis. The interaction here was not perfect; it was constitutional.

1

## II. Standard of Review

As pertinent, the district court reviews a magistrate judge's recommended disposition under 28 U.S.C. § 636(b)(1)(B) and Rule 59(b). When a party objects with adequate detail, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); Rule 59(b)(3) (requiring that district judge "must consider de novo any objection"). The district court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); Rule 59(b)(3) (enumerating options). In addition to the multiple layers of briefing, the Court has carefully reviewed the hearing transcript and has canvassed all submitted exhibits as part of its *de novo* review.

## III. Discussion

Lewis objects to three core findings in Judge Ingram's Recommended Disposition. Contrary to the recommendation, Lewis contends: (1) the officers lacked reasonable suspicion to stop his vehicle, (2) the officers lacked probable cause to stop (and then, to search) his vehicle, and (3) the *Miranda* warnings provided at the London police station were unproven and ineffective. *See* DE 59. The Court addresses each objection in turn.

### a. The Traffic Stop

Lewis first argues that the officers lacked reasonable suspicion or, separately, probable cause to initiate the traffic stop. *See* DE 59 at 2-14. A traffic stop is a seizure under the Fourth Amendment. *See United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009). The Sixth Circuit analyzes traffic stops using two tests: "[A]n officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). "Probable cause to conduct

2

a traffic stop is conferred where . . . an officer observes a motorist violate a traffic law." *United States v. Lott,* 954 F.3d 919, 923 (6th Cir. 2020). When an officer's traffic stop is supported by probable cause, the officer's subjective intent behind or motivations for a stop are irrelevant. *See Whren v. United States*, 116 S. Ct. 1769, 1774 (1996).

Reasonable suspicion demands less than probable cause. Nevertheless, reasonable suspicion of criminality requires "more than an ill-defined hunch; it must be based upon 'a particularized and objective basis for suspecting the particular person . . . of criminal activity.'" *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008) (quoting *United States v. Cortez*, 101 S. Ct. 690, 695 (1981)). Relevant here, an "officer's reasonable suspicion need not arise exclusively from his own direct observations. . . [but] can be derived from such sources as informant tips, dispatch information, and directions from other officers." *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008). "[O]fficers are permitted 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *Shank*, 543 F.3d at 313 (quoting *United States v. Martin*, 289 F.3d 392, 398 (6th Cir. 2002)). As with probable cause, courts examine the totality of the circumstances to determine whether the officer had reasonable suspicion. *See id.* at 315.

### *i. Reasonable Suspicion*

Here, TFO Dalrymple and Sergeant Bormann validly conducted a "*Terry* stop" based on reasonable suspicion of ongoing drug trafficking. TFO Jordan had, over the course of two days, developed information from a known and recently arrested confidential source of information (SOI). *See* DE 45 at 75:7-13. Jordan knew or had known of the SOI for 5-6 years. *Id.* at 75:14-20. After his arrest, the SOI shared significant background information with TFO Jordan indicative of Lewis's role as a meth supplier in Clay County. *See id.* at 58:2-11. This included details of Lewis's

3

trafficking (recent deals and buyers), details of his vehicles (a white Tesla and a dark SUV), and the state of registration for each (Indiana). *See id.* at 60:1-9, 61:23-62:3. The SOI shared with Jordan screenshots from his phone and taped recorded calls between the SOI and Lewis that corroborated drug-related contact and history. *See id.* at 58:5-59:8. On July 3, 2021, the SOI kept Jordan apprised in real time on Lewis's progress toward Clay County to make an alleged 5-pound meth delivery. *See id.* at 62:10-63:5.

The communications (included in DE 42 Gov. Ex. 1 to the suppression hearing) verified Lewis's name and pinpointed his progress—including an 8:09 p.m. photo under Lewis's name and showing his precise location in Lexington, on the way to Clay County. *See id.* That photo, part of Government Exhibit 1, supported the view that Lewis was in a dark vehicle. As Lewis progressed south, he alerted the SOI when he arrived in London. *See id.* at 64:11-13. Authorities (at the ready) soon enough saw him pass on the route to Clay County. *See id.* at 64:8-10. After Lewis's plates returned invalid registration, Sergeant Bormann made the stop. *See id.* at 8:5-16.

Sergeant Bormann had reasonable suspicion to stop Lewis's car. The officers received a tip from a semi-known informant describing a distinct car, its direction, its anticipated destination, and expected criminal conduct at that destination. *See id.* at 61:8-63:5. The SOI had contemporaneous exchanges with a "Kelly Lewis" that were consistent with a discussion of drug trafficking (discussions of money retrieval, the meet location, the short nature of the trip, and the need to meet somewhere away from a recent bust).[1] *See id.* at 60:1-9, 61:23-62:3. The SOI described the vehicle, person, and precise time of arrival. *See id.* at 61:20-63:11. The officers

---

[1] This strongly counters the suggestion by Lewis that the SOI reported innocent activity observable by anyone. The SOI had substantive (and plausibly) drug-based interactions with Lewis. His observations and predictions hewed closely to a planned and forecasted Clay County meth delivery.

4

encountered a dark SUV with Indiana plates just when and where Lewis would have been expected to travel; this happened, not on I-75, but on a less-travelled route to Clay County. *See id.* at 63:12-65:4. The officers were unable to link the plate to a valid registration.

Reasonable suspicion is not a high bar; the Court probes for specific and articulable facts, a particularized and objective basis, supporting suspicion.[2] That exists here in abundance. The SOI documented prior interactions evidently criminal in nature. *See id.* at 60:1-9. The SOI had current information about an incriminating trip. *See id.* at 61:23-62:9. The SOI validated the current data with direct trip tracking. *See id.* at 62:10-63:11. The target arrived as promised in a promised vehicle. *See id.* at 64:6-10. The target's own communications were of a suspiciously criminal tone. The SUV lacked valid plates. *See id.* at 8:8-11. These, on the totality, support the Terry stop.

Lewis argues that the officers could not use the information provided by the SOI because the tendered tip was unreliable. *See* DE 59 at 3-4 (Objections to Recommended Disposition). The Court disagrees. "[W]hen part of the reasonable-suspicion equation includes a tip from an informant, the weight to which that tip is entitled falls along a broad spectrum." *United States v. Williams*, 483 F. App'x 21, 25 (6th Cir. 2012). "Tips that provide specific details or predictions of future action fall higher on the reliability scale because they suggest the existence of knowledge to which the public might not have access." *Williams*, 483 F. App'x at 25 (citing *Alabama v. White*,

---

[2] Examples of circumstances supporting reasonable suspicion include: a confidential informant "whose information ha[s] been reliable in the past, [and who] informed officers of a pending drug delivery and provided the vehicle's description prior to the stop," *United States v. Salas*, 820 F. App'x 405, 412 (6th Cir. 2020), a distinctive and matching description of a vehicle, *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000), or confirming the expected location of a vehicle and direction it is travelling, *United States v. Molina*, 226 F. App'x 523, 528 (6th Cir. 2007); *United States v. Simms*, No. 20-9-DLB-EBA, 2020 WL 7769092, at *2 (E.D. Ky. Dec. 30, 2020). All of these indicia were present to some degree in this case. True enough, the history of reliability is scant. However, the SOI's current fund of knowledge involved direct and immediate interactions with Lewis and predicted conduct (for an arguable drug deal) that hit on all augured aspects.

5

110 S. Ct. 2412, 2417 (1990)). Anonymous tips gain reliability with independent police corroboration. *See White*, 110 S. Ct. at 2416. Greater reliability endows a tip with greater weight. *See id.* And, while the Government "must state facts supporting an independent judicial determination that the informant is reliable, those facts need not take any particular form." *United States v. McCraven*, 401 F.3d 693, 697 (6th Cir. 2005).

Here, the officers received a tip with specific details and predictions about future action, corroborated the tip independently, and, accordingly, acted on the tip given its reliability. As in *Alabama v. White*, the officers received a tip asserting a suspect would carry drugs, drive a car matching a particular description, and arrive at a named location. *See White*, 110 S. Ct. at 2416-17. Further, the SOI also provided TFO Jordan with a confirmatory photo taken from the suspect's phone showing the suspect driving south on I-75 at the I-64 intersection. *See* DE 45 at 62:10-24; *see also* DE 42 Gov. Ex. 1 at 10. As in *White*, although the SOI's tip alone might not have provided sufficient reliability to support reasonable suspicion, the officers' observations sufficiently corroborated the tip to ripen reasonable suspicion of drug trafficking afoot. *White*, 110 S. Ct. at 2417;[3] *see also United States v. Keeling*, 783 F. App'x 517, 522 (6th Cir. 2019) ("Independent corroboration of a tip further augments an informant's reliability.").

---

[3] The Supreme Court held that an "unverified tip from [a] known informant might not have been reliable enough to establish probable cause, but nevertheless [was] sufficiently reliable to justify a *Terry* stop." *White*, 110 S. Ct. at 2416.

Further supporting reliability, above that at issue in *White*, this case did not involve an anonymous informant,[4] but a tipster that TFO Jordan knew or knew of for five years and had just encountered following a state arrest. *See* DE 45 at 81:6-8. Jordan and the SOI had detailed interactions, backed up by historical and contemporaneous documentation, in the day before Lewis's predicted Clay County excursion. The tip corroborated by the officers was sufficiently reliable; this, with all of the confirmatory circumstances, supplied the officers reasonable suspicion to stop Lewis. Accordingly, the Court **OVERRULES** Lewis's first objection.

### *ii. Probable Cause*

Lewis next contends that probable cause did not support the stop, as to a traffic infraction. *See* DE 59 at 11-14. This was an alternative basis in Judge Ingram's handling. The Court disagrees. Even if the officers lacked reasonable suspicion, they were justified in stopping Lewis based on probable cause that Lewis violated Kentucky's vehicle registration statute. An officer may legally stop a car when probable cause exists to believe that a traffic violation has occurred. *See Bell*, 555 F.3d at 539. In Kentucky:

> Before the owner of a motor vehicle . . . may operate it or permit its operation upon a highway, the owner shall apply for registration in accordance with administrative regulations promulgated by the cabinet, except . . . [i]f the owner of a motor vehicle does not reside in the Commonwealth, the motor vehicle shall be registered with the county clerk of the county in which the motor vehicle is principally operated.

KRS § 186.020(1).

---

[4] Unlike an anonymous tipster, a known informant's "reputation can be assessed and . . . [the informant] can be held responsible if her allegations turn out to be fabricated." *Florida v. J.L.*, 120 S. Ct. 1375, 1377 (2000). Here—although TFO Jordan did not know if the SOI had provided other information on Lewis or worked as a SOI previously, *see* DE 45 at 75:7-20, 81:6-8—he knew the SOI and obviously had his identity. *See id.* at 75:7-20. He therefore could have held the SOI responsible for fabricated information. This is another factor in support of the validity of the officers' basis for suspicion.

7

Sergeant Bormann ran the SUV's plate pre-stop, and dispatch reported no registration information on the Indiana tag. *See* DE 45, at 8:8-11. Bormann ran the tag to verify the registration information, which would confirm proper registration and rule out a stolen vehicle. *See id.* at 8:8-9:3. He viewed the inability to confirm out-of-state information as not "unusual." *Id.* at 8:17-19. However, the witness from dispatch testified that such a check—regardless of the tag's licensing state—normally produced the vehicle's "registration status, registered vehicle owner, what the expiration date is, all the information, insurance information sometimes, depending on [the] state." DE 45 at 24:7-11. Here, upon running Lewis's license plate through the Laurel County Dispatch Center, Sergeant Bormann received a report of "no record, not on file." *See id.* at 24:1-16.

All vehicles require proper registration, when operating on Kentucky roads. Sergeant Bormann checked the recognized system and could not confirm the propriety of Lewis's registration. He had probable cause[5] to believe Lewis had failed to register his vehicle, in violation of Kentucky law. *See, e.g.*, *United States v. Justice*, 464 F. App'x 448, 451-52 (6th Cir. 2012) (holding an officer had probable cause to stop a vehicle when dispatch notified him that, as was the case for Lewis's vehicle here, the defendant's vehicle had "no registration record on file"); *see also United States v. Cathey*, No. 5:09-CR-0002-TBR, 2009 WL 2046140, at *2 (W.D. Ky. July 10, 2009) (validating a stop, for lack of "proper registration" under KRS § 186.020, when an officer confirmed improper registration through dispatch). The officers had probable cause to stop Lewis

---

[5] "Probable cause is defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.' It requires 'only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *United States v. Macklin*, 819 F. App'x 372, 376 (6th Cir. 2020) (citations omitted). An officer seeing a violation suffices. *Salas*, 820 Fed. App'x at 411.

for violating Kentucky's vehicle registration statute.[6] The Court **OVERRULES** Lewis's second objection.

The sub-objection on search validity also and correspondingly fails. The valid stop immediately led to (a) confirmation of Lewis's identity, and (b) confirmation of drugs within the SUV. *See* DE 45 at 10:4-6, 9:24-25. Lewis denied consent to search, but he offered up a marijuana cigarette (verified by Sergeant Bormann and documented in the hearing exhibits). *See id.* at 9:14-25. Sergeant Bormann received the blunt and immediately could smell marijuana. *See* DE 45 at 9:24-25, 18:11-16. Such contraband in the vehicle would itself establish unassailable probable cause to search. In the traffic stop context, the smell of marijuana emanating from a vehicle can supply probable cause to search the vehicle. *See, e.g.*, *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002). An officer also has probable cause if a suspect admits to possessing marijuana in the car. *See United States v. Lott*, No. 6:17-CR-52-GFVT, 2018 WL 2347072, at *3 (E.D. Ky. May 23, 2018), *aff'd*, 954 F.3d 919 (6th Cir. 2020). If officers have probable cause to search a vehicle, however, the officers must tailor their search to those areas of the passenger compartment—and associated containers—that could stow the object of the search. *See United States v. Stubblefield*, 682 F.3d 502, 507 (6th Cir. 2012). By giving Sergeant Bormann the joint, Lewis handed him

---

[6] Lewis partly contends that the officers lacked probable cause because they did not actually cite Lewis for violating KRS § 186.020(1) or any civil infraction. *See* DE 59 at 11. Lewis's position, however, adds requirements where none exist. An officer need not issue a citation for every observed traffic violation. *See e.g.*, *United States v. Muyet*, 946 F. Supp. 302, 314 (S.D.N.Y. 1996) (finding an officer conducted a lawful traffic stop after observing a traffic violation, even though the officer did not issue a traffic citation). Lewis does not cite any authority to support his contrary position, and the Court does not independently find any. Indeed, *Whren* expressly severs the stop validity from the ultimate subject matter subjectively animating the stop. Especially given the strength of the *Terry* stop basis, it is easy to see that the officers here might forgo the small fry of an infraction when dealing with a car ferrying 5 pounds of meth.

probable cause to search the vehicle for marijuana as well.[7] *See, e.g.*, *United States v. Ross*, 300 F. App'x 386 (6th Cir 2008) (upholding a vehicle search conducted after the defendant handed the officer "a small plastic bag of marijuana"). The proper search yielded the cache of meth; there is no suppression basis as to the search.

### b. Midstream Miranda Warning Effectiveness

Next, Lewis contests the effectiveness of the *Miranda* warnings issued at the London police station. *See* DE 59 at 14-15. Lewis faced two questions post-arrest and pre-*Miranda*, while still at the stop scene. Although whether and how he answered is not clear, any interrogation at that point was improper. The United States concedes that point and disavows any pre-*Miranda* statement use.

The fight is over the effect of the station house warnings. The Supreme Court, by a plurality, charted a five-factor test to determine whether "midstream" *Miranda* warnings are effective. *See Missouri v. Seibert*, 124 S. Ct. 2601, 2612 (2004). After initially avoiding the issue, the Sixth Circuit eventually adopted the five-factor test. *See United States v. Ray*, 803 F.3d 244, 272 (6th Cir. 2015). This test hinges on whether "a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, [and whether] the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission." *Ray*, 803 F.3d at 272-73; *Seibert*, 124 S. Ct. at 2613.

First, the Court considers "the completeness and detail of the questions and answers in the first round of interrogation." *Seibert*, 124 S. Ct. at 2612. TFO Dalrymple asked Lewis only three

---

[7] Lewis attempts to distinguish his case by relying on *Butler v. United States*, 102 A.3d 736 (D.C. Ct. App. 2014). In *Butler*, the D.C. Court of Appeals actually reconfirmed that "the smell of marijuana 'generally' emanating from [a] vehicle—[] indisputably would allow the police to search the *vehicle* for contraband[.]" *Id.* at 741. *Butler* is little help to Lewis.

questions in the Dollar General parking lot: "How much you got, bro?" "Have you ever been to prison?" and "For what?" *See* DE 45 at 53:24-54:24; *see also* DE 27 (Conventional Filing) Rec. at 2:10-19, 2:47-49.[8] The Court can discern no answer to the first question; it seems Lewis answered the second, and the third is indeterminate. This factor favors effective *Miranda* warnings. The parking lot interrogation, such as it was, was generic, non-specific, and free of detailed questioning (and even more free of detailed answering). Other than confirming a prison stint, here a mildly incriminating topic, the questions could hardly establish a conclusive admission on the facts of the crime. This first factor does not support suppression.

The Court next considers the second and fifth factors in tandem: that is, "the overlapping content of the two statements," and "the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 124 S. Ct. at 2612. In the parking lot, Lewis offered a vague answer to Officer Dalrymple's curt question on his criminal history. *See* DE 27 Rec. at 2:10-19, 2:47-49. The first interrogation was cursory, drawing no intelligible response. However, at the London police station, Lewis detailed a prior sale to a buyer in Clay County, payment details from that meth sale, his intent to deliver meth to Clay County, his recent meth purchase in Lexington, and his lack of knowledge regarding the identity of his source of supply.[9] *See* DE 25-3 at 2-3 (DEA ROI, discussing statements). The content did not, therefore, overlap and the record does not indicate that any officer treated the police station interrogation as continuous with the first generic query. The officers did not seek to exploit statements from round one to glean

---

[8] All pin cites to recorded footage track the video time stamps.
[9] Notably, neither the hearing transcript nor the DEA Form 6 indicates that Lewis disclosed any information about his criminal background. Also, although Lewis discussed the amount of meth he possessed during the London police station interrogation, this information was already known by the Officers after they searched the vehicle. *See* DE 25-3 at 2; *see also* DE 45 at 11:1-4, 71:3-10.

new, detailed information in round two—the exact conduct the Supreme Court criticized. *See Seibert*, 124 S. Ct. 2613. The second and fifth factors, therefore, do not support suppression.

Third, the Court considers "the timing and setting of the first and the second [interrogation]." *Seibert*, 124 S. Ct. 2612. Unlike *Seibert*, the defendant in this case was interviewed in two separate locations—first, briefly, in the Dollar General parking lot and second at the London police department. *See* DE 45 at 9:4-5, 69:6-71:10. Thus, the setting differed. Concerning timing, the second interrogation occurred approximately twenty-five to thirty minutes after the first interrogation. *See* DE 45 at 69:6-13; DE 27 Rec. at 2:47-14:01. The changed location and lapse in time favor finding effective midstream *Miranda* warnings. *See United States v. Conway*, No. CR 17-43-DLB-CJS, 2018 WL 4600306, at *14 (E.D. Ky. June 4, 2018), report and recommendation adopted, No. CR 17-43-DLB-CJS, 2018 WL 3435353 (E.D. Ky. July 17, 2018). There was an actual break in the sequence. The first encounter, two questions' worth, yielding little of substance, occurred in the lot, mid-search. The second encounter happened, at the station, post-transport, and only after a full *Miranda* warning. Thus, the third factor also does not support suppression.

Finally, the Court considers "the continuity of police personnel." *Seibert*, 124 S. Ct. 2612. TFO Dalrymple questioned Lewis in the Dollar General parking lot and TFO Jordan led the interrogation at the London police station. *See* DE 27 Rec. at 2:16-18; DE 45 at 71:11-21. However, the same officers were present across both interrogations. Therefore, this factor signals ineffective midstream *Miranda* warnings, favoring suppression.

Considered together, the *Seibert* factors indicate TFO Jordan gave Lewis effective midstream *Miranda* warnings. The changed location, lapse in time, lack of overlap between the interrogations, and brevity of (and low yield from) the first interrogation all indicate that Lewis

reasonably could and should have seen the London police station questioning as a "new and distinct experience." *Ray*, 803 F.3d at 272. The midstream warnings ensured Lewis's awareness of the panoply of afforded rights in advance of any detailed discussion of the crime at issue. Judge Ingram expertly sorted these factors; the Court sees the matter as he did.

Lewis contends that, even if the midstream warnings were effective, "the government failed to produce any evidence that the Defendant waived his *Miranda* rights." *See* DE 59 at 15. The waiver inquiry has "two distinct dimensions": voluntariness and full comprehension. *Moran v. Burbine*, 106 S. Ct. 1135, 1141 (1986).

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Id.* The Government must prove waiver by a preponderance of the evidence. *See Colorado v. Connelly*, 107 S. Ct. 515, 522 (1986); *see also Moore v. Berghuis*, 700 F.3d 882, 887 (6th Cir. 2012). A defendant need not expressly waive his *Miranda* rights; a written waiver is not required. *See United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009). Instead, the Court may infer waiver "from the actions or words of the person interrogated." *North Carolina v. Butler*, 99 S. Ct. 1755, 1757 (1979); *see also Adams*, 583 F.3d at 467. The Court considers the totality of the circumstances to analyze whether the defendant validly waived *Miranda* rights. *Moran*, 106 S. Ct. at 1141.

The Court finds the waiver here valid. Upon arriving at the London police station, TFO Jordan immediately retrieved the DEA Form 13-A standard *Miranda* warnings and read those warnings to Lewis. *See* DE 45 at 68:14-21. DEA Form 13-A, included in the record, covered the full scope of Lewis's *Miranda* rights: the right to silence, the knowledge that Lewis's statements

13

could be used against him in court, the right to counsel before and during questioning, and the knowledge that Lewis would be eligible for an appointed attorney, before commencing questioning, if he could not afford one. *See* DE 42 (Witness and Exhibit List) Gov. Ex. 4. (DEA Form 13-A). Finally, DEA Form 13-A confirmed that Lewis understood those rights and was willing to answer questions. *See id.* Upon receiving those warnings, Lewis "was cooperative" and divulged granular information related to his role distributing meth. *See id.* at 71:3-10. He never asked for a lawyer. *See id.* at 71:22-23. He never asked for the officers to stop questioning him. *See id.* at 71:24-25. Lewis has no criticism of the form's content. The only proof as to the application of the warnings and Lewis's response is the sworn testimony from the hearing. Thus, the only proof is that the warnings happened, and that Lewis then, well advised, submitted to questioning.

Based on both *Moran* dimensions, the Court finds the Government produced sufficient evidence that Lewis validly waived his *Miranda* rights. The warnings were written in plain, digestible language, spanned Lewis's *Miranda* rights, and confirmed Lewis's understanding. *See* Gov. Ex. 4. This indicates Lewis acted in full awareness of the nature and scope of his *Miranda* rights. Also, Lewis's cooperation after receiving those warnings indicates he acted free from coercion or intimidation. *See* DE 45 at 71:3-10. He never asked for a lawyer or to cease questioning. *See* DE 45 at 71:22-25. There is no evidence of coercion or any action by the Government to overbear Lewis's will. The Government met its burden. The Court, therefore, **OVERRULES** Lewis's third and final objection.

## IV. Conclusion

For the foregoing reasons, the Court **ADOPTS** the DE 58 Recommended Disposition. Other than the parking lot questioning, the Court refuses to suppress any of the stop-related proof and any of the station house statements made by Lewis.

This the 12th day of April, 2022.

Signed By:
*Robert E. Wier*
United States District Judge